## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO 0:20-CV-62165

**CRICKET WIRELESS LLC, AT&T MOBILITY LLC, and AT&T INTELLECTUAL PROPERTY II, L.P.,**

**JURY TRIAL DEMANDED**

Plaintiff,

v.

**NOELTHETECHEXPERTS, LLC, NOEL BROWN, and JOHN DOES 1-20,**

Defendants.

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Cricket Wireless LLC ("Cricket" or "Cricket Wireless"), AT&T Mobility LLC ("AT&T PREPAID") and AT&T Intellectual Property II, L.P. (collectively "AT&T" or "Plaintiffs"), hereby file this Complaint for Damages and Injunctive Relief against Defendants Noel Brown, NoelTheTechExperts, LLC, and John Does 1-20 (collectively "Defendants") and state:

### PARTIES

1.      Cricket Wireless LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

2.      AT&T Mobility LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

3.      AT&T Intellectual Property II, L.P. is a Nevada limited partnership with a place of business at 754 Peachtree Street, NE, Atlanta, Georgia 30319.

1

4.     Defendant NoelTheTechExperts, LLC is a Florida limited liability company with its principal place of business and mailing address at 2330 SW 163rd Terrace, Miramar, Florida 33027.

5.     Defendant Noel Brown ("Brown) is an individual who is a resident of Florida and who conducts business transactions in this District as alleged herein.  Upon information and belief, Noel Brown is the owner and the registered agent for NoelTheTechExperts, LLC.  Upon information and belief, Mr. Brown is located at 2330 SW 163rd Terrace, Miramar, Florida 33027.

6.     Upon information and belief, Defendants John Does 1-20 are individuals and co-conspirators who participate in other aspects of the Prepaid Phone Trafficking Conspiracy set forth below, including but not limited to purchasing and reselling AT&T Phones (as defined below in paragraph 10), obtaining and supplying unlocking codes, providing phone unlocking services, and/or reselling and shipping AT&T Phones overseas.

## JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because AT&T's claims for violation of the United States Trademark Act, Title 15 of the United States Code, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., and the United States Copyright Act, Title 17 of the United States Code, arise under federal law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over AT&T's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.  This Court also has jurisdiction because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.

8.     Defendant NoelTheTechExperts, LLC is subject to the personal jurisdiction of this Court because it is a Florida company with its principal place of business in the State of Florida.  The individual Defendants are subject to the personal jurisdiction of this Court because they have conducted, engaged in and carried out business ventures within the State of Florida, including unlocking new AT&T Phones without authorization, or have committed tortious acts within the State of Florida, and have engaged in substantial and not isolated activity within the State of Florida.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## NATURE OF ACTION

10.     AT&T PREPAID™ (f/k/a AT&T GoPhone) sells new prepaid wireless phones and other mobile devices under the AT&T brand.  Cricket Wireless sells new prepaid wireless phones and other mobile devices under the Cricket brand.  These devices (collectively "AT&T Phones" or "Phones") are intended for use with SIM cards from the AT&T Mobility or Cricket Wireless networks (collectively, the "AT&T Authorized Networks"), and are sold at prices lower than the wholesale price of the Phones as sold to AT&T to make them more widely accessible to consumers.  The Phones are physically branded with AT&T's registered trademarks and are preloaded with AT&T proprietary software.  AT&T sells its Phones directly from the AT&T PREPAID and Cricket Wireless websites, from retail stores owned by AT&T, through authorized AT&T and Cricket dealers ("Authorized Dealers"), and through AT&T approved national retail chains such as Best Buy, Walmart, or Target ("National Retailers").

3

11.     Defendants and their co-conspirators are perpetrators of an unlawful conspiracy (the "Conspiracy" or "Prepaid Phone Trafficking Conspiracy") to profit from the illegal acquisition, unlocking and resale of new bulk AT&T Phones by misappropriating the substantial financial investment that AT&T makes in its Phones, and converting that investment for their own profit and to the detriment of AT&T and its customers.  Defendants profit directly by providing unlocking services and unlock codes to their co-conspirators for a fee.

12.     Upon information and belief, the Prepaid Phone Trafficking Conspiracy involves Defendants' co-conspirators directly or indirectly acquiring new, locked AT&T Phones, ineligible for unlocking, directly from AT&T, at National Retailers, and/or at AT&T and Cricket Authorized Dealers.  As part of this Conspiracy, the Phones, which may be purchased and resold multiple times, are ultimately resold to someone other than a consumer with whom AT&T has a business relationship.  These Phones are not activated in an authorized manner on an AT&T Authorized Network.  Instead, Defendants provide their co-conspirators with services in either illicitly circumventing, or causing to circumvent, a technological protection measure, or by providing co-conspirators with an unlock code specific for each individual new AT&T Phone for permanently unlocking the phone without authorization.  Once the new Phones are unlocked, they can operate on other carriers' wireless networks.  Upon information and belief, Defendants' co-conspirators then offer for sale AT&T Phones that they represent to be new.  Upon information and belief, the ultimate users of the Phones may even be located overseas, in a country where the wireless service provider does not subsidize the cost of new phones.

13.     Defendants' Prepaid Phone Trafficking Conspiracy takes advantage of AT&T's investment in its Phones to reduce the costs for its consumers.  Defendants and their co-conspirators directly or indirectly obtain, and conspire to obtain the new AT&T Phones under

false or fraudulent pretenses that they will be utilizing the phones on the AT&T Authorized Networks, but then unlock and resell or divert them to other markets.  The Prepaid Phone Trafficking Conspiracy converts AT&T's investment dollars into substantial profits for Defendants and their co-conspirators.  In addition, Phones resold by Defendants are materially different from AT&T Phones sold through legitimate channels, as they are unlocked, and/or sold without warranty information, original packaging and accessories.  While Defendants' role in the Conspiracy may not involve each step of the Conspiracy, each of Defendants' acts is a violation of AT&T's rights and causes significant damage to AT&T.  Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to AT&T by the entire Conspiracy.

14.     The Prepaid Phone Trafficking Conspiracy causes tremendous harm to AT&T and to consumers.  In addition to the pecuniary losses caused by AT&T's misappropriated investment in the Phones, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct has harmed AT&T's relationships with its customers, Authorized Dealers, National Retailers, and others.  Defendants' Prepaid Phone Trafficking Conspiracy also involves unlawfully accessing AT&T's protected computers; trafficking of AT&T's protected and confidential computer passwords; willful infringement of AT&T's trademarks; and/or misappropriating AT&T's investment in subsidizing new mobile devices.  AT&T Phones fraudulently acquired and resold under Defendants' Prepaid Phone Trafficking Conspiracy have also caused substantial damage to AT&T's brand, image and reputation.

15.     AT&T seeks to recover damages for the harm caused by Defendants' Prepaid Phone Trafficking Conspiracy, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Prepaid Phone Trafficking Conspiracy.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

**I.      AT&T's Prepaid Phone Business**

16.      AT&T is one of the largest providers of prepaid wireless service in the United States, and markets its service under the AT&T PREPAID and Cricket marks.  AT&T currently serves millions of customers nationwide and has developed a highly regarded business reputation in the public and amongst its customers for deploying innovative technologies and services for its customers.

17.      AT&T PREPAID and Cricket customers can choose from a variety of prepaid monthly voice and data plans for use on cutting edge devices on the AT&T Mobility or Cricket Wireless networks.  In addition to availability online, over the phone through authorized customer service representatives, and at retail stores owned by AT&T, AT&T Phones and wireless service are sold through Authorized Dealers and National Retailers across the country.

18.      AT&T's prepaid business model depends on AT&T's ability to deliver high-quality phones at affordable prices.  AT&T sells the Phones for substantially less than what AT&T pays to the manufacturers for the Phones in order to attract legitimate customers of AT&T Phones for use on the AT&T Mobility or Cricket Wireless networks.

19.      AT&T is able to subsidize the cost of the Phones based on expected wireless service revenue.  Except in limited circumstances not applicable here, AT&T Phones must be used on an AT&T Authorized Network for the first six months after activation (the "AT&T Service Period") before they can be legitimately unlocked by AT&T and used on any other network.  Each of the prepaid AT&T Phones is locked to the AT&T Authorized Networks until unlocked.

20.     In addition to subsidizing AT&T Phones, AT&T also offers discounts, rebates, and other incentive programs to its customers, such as discounts for customers who are transferring an existing phone number, or discounts to customers who add additional lines for friends and family on the same account.  Upon information and belief, telecommunications carriers outside the United States do not offer substantial subsidies and investment programs for prepaid mobile phones.  Instead, their consumers must pay the full price for the phones to purchase the phone from manufacturers.

21.     AT&T requires its customers to review and agree to Terms and Conditions when using AT&T Phones.  The Terms and Conditions are a valid and binding contract between AT&T and each of its customers.  As set forth below, the packaging for prepaid AT&T Phones provides notice of the Terms and Conditions, directs customers to the full text of the Terms and Conditions, and indicates that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the Terms and Conditions.

22.     AT&T's business model in offering its customers Phones at substantially reduced prices is viable only if the Phones are activated and used as intended on an AT&T Authorized Network during the AT&T Service Period.  AT&T requires manufacturers that produce wireless phones for AT&T to install software known as a "SIM Lock" on the AT&T Phones.  This SIM Lock is intended to prevent the Phones from being accessed or used outside the AT&T Authorized Networks during the AT&T Service Period unless AT&T receives a valid request from a legitimate AT&T customer, and unlocks the Phone or provides the customer with an unlock code.

23.     To maintain its standing as a leader in a competitive industry, AT&T expends substantial resources to provide its vast and reliable nationwide wireless network, and to ensure

that its customers are able to acquire high-quality phones at affordable prices for use on the

AT&T Authorized Networks. AT&T prepaid phone subsidies and discounts are essential to

AT&T's ability to offer affordable, high-quality phones to its customers. In turn, to be able to

offer such subsidies and support its wireless network, AT&T depends on legitimate customers

activating and using their Phones on AT&T Authorized Networks during the AT&T Service

Period.

## II.    **AT&T's Trademarks**

24.    AT&T owns federal trademark registrations for the standard character and

stylized AT&T®, GOPHONE®, and Cricket® marks for a wide variety of goods and services,

including telecommunications services and cellular telephones, as depicted below:

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **GO PHONE** | Reg. No. 2048570 | 04/01/1997 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **GOPHONE** | Reg. No. 2911779 | 12/14/2004 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **CRICKET** | Reg. No. 2359369 | 06/20/2000 | Cl. 38: Telecommunications services, namely offering personal communications services via wireless |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| | | | networks; and providing cellular telephone services and personal communication network (PCN) services |
| **CRICKET** | Reg. No. 2359370 | 06/20/2000 | Cl. 9: Wireless communication apparatus, namely, cellular telephones; telephone accessories, namely, fitted carrying cases, belt clips, battery chargers; integrated wireless communication and computing apparatus, namely, cellular telephones; and telephone accessories, namely, fitted carrying cases, belt clips, battery chargers |
| **CRICKET** | Reg. No. 2363821 | 07/04/2000 | Cl. 35: Retail store services featuring wireless communication apparatus, namely, modems, cellular telephones, wireless local loop telephones and personal communication services (PCS) handsets with manuals and accessories sold as a unit therewith, telephone accessories, namely, fitted carrying cases, belt clips, battery chargers and batteries, and car kits consisting of audio speakers, microphones, and external antenna connectors; integrated wireless communication and computing apparatus namely, cellular telephones, wireless local loop telephones and personal communication handsets combined with a computer or personal digital assistant (PDA) device with manuals and accessories sold as a unit therewith; and telephone accessories, namely, fitted carrying cases, belt clips, battery chargers and batteries, and car kits consisting of audio speakers, microphones, and external antenna connectors |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **AT&T** | Reg. No. 3884434 | 11/30/2010 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, 45, including telecommunications services, telephones, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services, |
| **AT&T GOPHONE** | Reg. No. 4049377 | 11/01/2011 | Cl. 38: Telecommunications services, namely wireless transmission, uploading and downloading of voice, data, images, audio, video, signals, software, information, games, ring tones and messages; wireless telephone services; providing wireless calling plans; wireless voice messaging services; wireless text and numeric digital messaging services; wireless roaming services |
| cricket | Reg. No. 4785913 | 08/04/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |
|  | Reg. No. 4773093 | 07/14/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | Reg. No. 5745786 | 05/07/2019 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | Reg. No. 5903410 | 11/05/2019 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | Reg. No. 5903411 | 11/05/2019 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, 37, 38, 41, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| | Reg. No. 5903412 | 11/05/2019 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |
| | App. No. 87878075 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
| | App. No. 87878227 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  AT&T | Reg. No. 5938885 | 12/17/2019 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
|  AT&T | Reg. No. 5938886 | 12/17/2019 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
| **AT&T PREPAID** | App. No. 88856328 | 04/04/2020 | Cl. 9:  Mobile phones; smart phones<br><br>Cl. 38: Telecommunications services, namely, wireless transmission, uploading and downloading of voice, data, images, audio, video, signals, software, information, games, ring tones and messages; wireless telephone services; communications services, namely, wireless mobile telephone calling, data and messaging service plans; wireless voice messaging services; wireless text and numeric digital messaging services; wireless roaming services |

Registration Nos. 2359369, 2359370, 2363821, 2911779, 3884434, and 4049377 are incontestable under 15 U.S.C. § 1065 and therefore conclusive evidence of AT&T's rights to the marks covered by them under 15 U.S.C. § 1115(b).

25.     AT&T owns common law rights in the AT&T PREPAID and Cricket character marks, which have been used in commerce in the United States since at least July 2017 and March 2014 respectively, on and in connection with its telecommunications products and services, including AT&T Phones. Collectively, AT&T's registered and common law marks are referred to as the "AT&T Marks."

26.     AT&T protects the AT&T Marks, which are the property of AT&T. The AT&T Marks are an essential and fundamental part of the identity and goodwill developed by AT&T. AT&T has spent enormous amounts of time, money, and effort advertising and promoting the products and services with which the AT&T Marks are used. Only AT&T and those it has expressly authorized are permitted to use the AT&T Marks. The AT&T Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with AT&T.

27.     Defendants are not affiliated with AT&T, are not AT&T Authorized Dealers or AT&T approved National Retailers, and are not otherwise expressly or implicitly permitted to use the AT&T Marks.

### III.     AT&T's Proprietary Software

28.     AT&T creates and develops proprietary software ("AT&T Software") in conjunction with manufacturers of AT&T Phones, wherein manufacturers develop software applications at AT&T's direction, using AT&T's proprietary intellectual property, design elements, specifications, and requirements.

29.     Copies of the AT&T Software are preinstalled on every AT&T Phone in the phone's firmware and in the baseband software. Unlike third-party applications that an end-user downloads from the Internet, the AT&T Software cannot ordinarily be removed from an AT&T

Phone by an end-user without unauthorized technical modifications.  Representative examples of such AT&T Software include the myCricket application preinstalled on Cricket Wireless branded Phones and the myAT&T application preinstalled on AT&T PREPAID branded Phones.

30.     Copies of the AT&T Software on AT&T Phones are never sold to purchasers of AT&T Phones.  Instead, AT&T grants non-exclusive, non-transferable licenses to use the AT&T Software to individual purchasers who accept End User License Agreements ("EULAs"), and/or through the Terms and Conditions referenced in the following section.  Copies of these EULAs are attached as Exhibit 1.  AT&T does not authorize any person who does not accept and comply with the terms of these EULAs to access or otherwise use copies of AT&T Software.

**IV.     AT&T Prepaid Phone Terms and Conditions**

31.     As set forth above, AT&T Phones are sold under the Cricket and AT&T PREPAID brands.  Cricket Wireless branded Phones are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones. A copy of the Cricket Wireless Terms and Conditions of Service ("Cricket Terms") is attached as Exhibit 2.  These Cricket Terms are set forth in printed inserts that are included in the packaging for Cricket Phones sold directly by AT&T, or at National Retailers, and are also available to the public on the Cricket Wireless website.  They are also referenced in printed warnings that are placed on the outside of the National Retailer packaging of the Cricket Phones. The Cricket Terms and language on the packaging constitute a valid binding contract.

32.     The National Retailer packaging in which new Cricket Phones are sold contains the following language that is printed on the outside of the package:

> This phone may only be used with Cricket service for the first six months after activation.  By purchasing, activating or using this phone or Cricket service you acknowledge and agree to the Terms and Conditions of Service available inside this package or at

> www.cricketwireless.com, which contains important information,
> including your agreement to dispute resolution by binding
> individual arbitration instead of jury trials or class actions.

33.     Similarly, customers at Cricket Wireless Authorized Dealers are presented with

the Terms and Conditions under which they are receiving service and devices at the time they

activate service and customers must accept those Terms and Conditions before finalizing their

transaction.  Additionally, the Terms and Conditions are included in each Authorized Dealer

device package.

34.     The Cricket Terms included in the Cricket Phone packaging also provide, in

pertinent part, as follows:

> You [] agree that you will not make, nor will you assist others to
> make, any modifications to any Device you purchase from Cricket
> or programming to enable it to operate on any other system or
> network except in accordance with our Device Unlocking Policy
> found at    www.cricketwireless.com/legal-info/device-unlock-
> policy.html. You understand and acknowledge that Devices you
> purchase from Cricket are sold solely for use with our network and
> that we will be significantly damaged if you use or assist others to
> use our Devices for any other purpose.
>
> …
>
> When you purchase, activate or use our Services or any Devices
> you agree that you will not misuse or abuse our Services or
> Devices by doing, among other things, any of the following: (a)
> purchasing a Device without intending to activate or use it on our
> network; (b) reselling or rebilling our Services, or reselling
> Devices purchased from Cricket; … [or] (e) using our Services or
> any Devices for any fraudulent or unlawful purpose[.]

35.     The AT&T PREPAID Phones at issue here are also sold subject to terms and

conditions which conspicuously restrict and limit the sale and use of the Phones.  A copy of the

AT&T PREPAID Plan Terms and Terms of Service ("AT&T PREPAID Terms") are attached as

Exhibit 3.  These AT&T PREPAID Terms are referenced in printed warnings that are placed on

the outside of the packaging of every AT&T PREPAID Phone sold directly by AT&T, at

National Retailers, or at Authorized Dealers, are also referenced in a printed Quick Start Guide

that is included in the packaging with every AT&T PREPAID Phone, and are also available to

the public on AT&T's website.  The AT&T PREPAID Terms constitute a valid binding contract.

36.     The packaging in which new AT&T PREPAID Phones are sold directly by

AT&T, at Authorized Dealers, or at National Retailers contains the following language that is

printed on the outside of the package:

> AT&T PREPAID: By activating or using AT&T PREPAID
> service, you agree to be bound by Terms of Service & Plan Terms
> available at att.com/prepaidterms. This phone is restricted to
> AT&T PREPAID service during the first six months after
> activation and cannot be used with any other carrier's service.
> Commercial resale is prohibited except by AT&T's authorized
> agents or retailers.

37.     The Quick Start Guide included in the AT&T PREPAID Phone packaging for

National Retailers provides, in pertinent part, as follows:

> AT&T PREPAID service is subject to the terms in the AT&T
> PREPAID Plan Terms & Terms of Service booklet or online at
> att.com/prepaidterms (both, the "Agreement").  By activating and
> using AT&T PREPAID service, you agree to be bound by the
> Agreement.

38.     Similarly, for customers purchasing AT&T PREPAID phones at AT&T

Authorized Dealers, the Terms and Conditions are included in each device package, and after

payment, each customer is provided with a Customer Service Summary document containing a

further reminder of the Terms and Conditions.  A copy of a representative Customer Service

Summary is attached as Exhibit 4.

39.     The AT&T PREPAID Terms provide, in pertinent part, as follows:

> Devices designed for use only on AT&T's network ("Equipment")
> may not function on other wireless networks.  Equipment is sold
> exclusively for use with AT&T PREPAID service and may not be
> resold.  By purchasing such Equipment you agree to activate and
> use it on AT&T PREPAID service.  You also agree that you will

not make, nor will you assist others to make, any modifications to the Equipment or programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems. You understand and acknowledge that the Equipment is sold solely for use with AT&T's prepaid service and that AT&T will be significantly damaged if you use or assist others to use the Equipment for any other purpose. You agree not to take any action to circumvent limits on the quantity of Equipment that may be purchased. You will be liable to AT&T for any damages resulting from the conduct prohibited in this section.

40. The restrictions and limitations in the Cricket Terms and AT&T PREPAID Terms and on National Retailer packaging are intended to restrict the use of AT&T and Cricket Phones solely to the AT&T Mobility and Cricket Wireless networks during the AT&T Service Period.

41. AT&T Phones may access the AT&T Mobility or Cricket Wireless Service only within the United States on all plans, and some plans also include access to roaming networks in Mexico and Canada (the "Coverage Area") during the AT&T Service Period.

42. During the AT&T Service Period, AT&T PREPAID and Cricket Phones are not authorized to or capable of accessing any cellular network other than the AT&T Mobility or Cricket Wireless networks, respectively, or third party wireless carrier networks with which AT&T has roaming agreements. AT&T Phones are programmed with a technological protection mechanism known as a "SIM Lock," which checks whether the inserted SIM card contains an approved network configuration. If the inserted SIM card contains an approved network configuration, such as the AT&T Mobility or Cricket Wireless networks, the SIM Lock allows use of the phone, and the phone connects to the authorized cellular network. If the SIM card does not contain an approved network configuration, the SIM Lock causes the phone to display a prompt to enter an unlock code. The SIM Lock prevents use of the phone on a network other than the AT&T Mobility or Cricket Wireless networks, and also prevents access to the AT&T Software until the correct unlock code is entered. As set forth in Cricket's Wireless Device

18

Unlock Policy ("Unlock Policy"), AT&T will only provide an unlock code to a customer if the Cricket Wireless Phone: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, 3) is designed for use and is locked to the Cricket network, and 4) has been active on the Cricket Wireless network for at least the six-month term of the Cricket Service Period.  A copy of the Cricket Unlock Policy is attached as Exhibit 5.  AT&T PREPAID Phones are subject to the following requirements under the AT&T PREPAID Unlock Policy, a copy of which is attached as Exhibit 6.  As set forth in the AT&T PREPAID Unlock Policy, AT&T will only provide an unlock code to a customer if the device: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, and 3) has been active on the AT&T Mobility network for at least the six-month term of the AT&T Service Period.

43.     AT&T stores and maintains unlock codes on computer servers that it owns ("AT&T Servers").  AT&T Servers are connected to the AT&T computer network, and to the Internet, but are not accessible to the general public.  AT&T controls access to the AT&T Servers, and determines who is authorized to access the AT&T Servers and under what circumstances.

44.     The "Unlock a Phone or Device" page on AT&T's website allows any person – including Defendants – to check at any time whether an AT&T Phone is eligible for unlocking by providing the International Mobile Equipment Identity ("IMEI") number for the Phone, and/or the AT&T mobile number associated with the Phone.  AT&T then sends an email or text message to the user confirming the request, and then sends another email or text message showing the Phone's eligibility for unlocking.  AT&T does not charge for this service.

45.     The "Device Unlock Codes" page on the Cricket website sets forth instructions for any person – including Defendants – to check at any time whether an AT&T Phone is eligible

for unlocking.  The page directs active Cricket customers to sign into My Account and visit the

Account Settings page, where they can request an unlocking code.  Upon receiving an unlocking

code request for an eligible phone, AT&T then causes the unlock code to be displayed on the

screen for users of Android phones, or sends the unlocking code by text message to users of

Apple iPhones.  The page also instructs all persons who are not Cricket customers to call Cricket

Customer Support to check unlocking eligibility.  AT&T does not charge for this service.

## V.     **Defendants' Misconduct**

46.     AT&T has discovered that large quantities of its Phones sold directly by AT&T,

at Authorized Dealers, and at National Retailers are not activated for use on the AT&T Mobility

or Cricket Wireless networks.  Defendants and their co-conspirators are fraudulently acquiring,

or causing to be acquired, unlocking without authorization and reselling new AT&T Phones in

bulk quantities.  Upon information and belief, Defendants' co-conspirators directly or indirectly

acquire the Phones under false or fraudulent pretenses, such as purchasing the Phones directly

from AT&T, from AT&T Authorized Dealers, or from National Retailers ostensibly for

activation and use on an AT&T Authorized Network.  New, locked AT&T Phones acquired by

Defendants' co-conspirators are in fact not activated on an AT&T Authorized Network, and are

ineligible for unlocking.  Defendants illicitly unlock the Phones for their co-conspirators, or

provide their co-conspirators with unlocking codes, so that the unlocked Phones can be used on

other carriers' wireless networks.  Defendants profit by charging their co-conspirators a fee for

illicitly unlocking the Phones or providing unlocking codes.  Some of the Phones are taken out of

their original packaging and resold without their original accessories, warranty documentation,

and manuals.  On information and belief, some of the Phones are ultimately shipped overseas.

Unlocked AT&T Phones can be used on any network in the United States or foreign carriers, and

as a result, Defendants' co-conspirators are able to sell unlocked phones for a higher price than locked phones sold by AT&T and its Authorized Dealers.

47.     Once a new AT&T Phone is unlocked for use with another carrier in the United States and/or shipped overseas to be used on other wireless networks, AT&T no longer has a revenue source to recoup its investment on that Phone.

48.     The process of unauthorized unlocking of AT&T Phones involves bypassing the SIM lock installed in the Phones, circumventing the electronic protections installed in the phone, which then allows the user of an unlocked phone to access and/or use the AT&T Software under conditions not authorized by AT&T.

49.     From a casual consumer's perspective, an unlocked AT&T Phone may look physically identical to an unaltered AT&T Phone.  The unlocked Phone is labeled with the same AT&T Marks as new AT&T Phones.  In addition, an unlocked AT&T Phone continues to display AT&T Marks on its screen when it is powered on.

50.     AT&T licenses, but does not sell, the copies of AT&T Software loaded onto AT&T Phones to end users.  Thus, Defendants do not lawfully own any copies of the AT&T Software.  The sole purpose for Defendants' Prepaid Phone Trafficking Conspiracy is for profiting at AT&T's expense and misappropriating AT&T's financial investment in the Phones.

51.     An agreement and conspiracy existed and continues to exist between and among each of the Defendants and their co-conspirators to unlawfully engage in the bulk purchase, trafficking, and resale of unlawfully unlocked AT&T Phones under the AT&T Marks.  While the full extent of Defendant's activities in the Prepaid Phone Trafficking Conspiracy is not yet known, Defendants have at least conspired to unlock new, locked AT&T Phones without authorization to allow their co-conspirators to resell the unlocked AT&T Phones to others.

52.    Defendants knowingly agreed to engage, and did engage in one or more overt acts in furtherance of the conspiracy as set forth with more particularity in this Complaint.

53.    AT&T has been proximately damaged by the conspiracy and by Defendants' actions in furtherance of the conspiracy.

54.    As set forth above, Defendants are neither AT&T Authorized Dealers nor AT&T approved National Retailers.  Defendants have no legitimate connection to AT&T.

55.    On March 4, 2019, AT&T's undercover investigators contacted Mr. Brown by telephone and text message, inquiring whether he could unlock certain models of AT&T Phones in their possession.  The investigators informed Mr. Brown that the Phones were new, locked, and in their original packaging.  On March 5, 2019, Mr. Brown spoke to the investigators by telephone, representing to the investigators that he could unlock the AT&T Phones.  Mr. Brown explained that he had connections to servers for several service providers, including AT&T, through contacts in Dubai, Pakistan, and Vietnam.  On March 13, 2019 and March 16, 2019, the investigators continued to correspond with Mr. Brown by text message.

56.    On March 18, 2019, Mr. Brown emailed the investigators with prices for unlocking the AT&T Phone models the investigators had identified.  Mr. Brown included different prices that he charged for unlocking phones using their IMEI number, or using a physical device that Mr. Brown described as an "unlock box."

57.    On April 2, 2019, the investigators emailed IMEIs for three LG Phoenix 4 and one LG Xpression Plus AT&T Phones to Mr. Brown, asking if he could provide unlocking codes for these Phones.  That same day, Mr. Brown called the investigators and explained the procedure for unlocking.  On April 3, 2019, Mr. Brown emailed the unlocking codes for the four AT&T Phones to the investigators.  Mr. Brown also emailed unlocking instructions to the

investigators, directing the investigators to first activate the new phones using an AT&T SIM card so that they could make a phone call before unlocking the phone.  In particular, Mr. Brown explained that the investigators should misrepresent to AT&T that they were going to commit to using the phone with an AT&T plan, and that they would pay AT&T for that plan: "when asked to activate plan go ahead and activate choose any random zip code and choose any random plan. Choose the option to pay later because *we won't pay* just need to get a line active on that imei so we can make a call."  On April 4, 2019, the investigators paid Mr. Brown $15 for each of the four AT&T Phones.  The investigators were able to unlock the new Phones using the unlocking codes and instructions that Mr. Brown provided.

58.     On April 8, 2019, the investigators informed Mr. Brown that they would be in the Miami, Florida area with additional new AT&T Phones they would like to have unlocked.  On April 10, 2019, the investigators sent Mr. Brown an email listing 26 new AT&T Phones that they would like to have unlocked, including the models and IMEIs of the Phones.  That same day, investigators met with Mr. Brown at his residence, in Miramar, Florida, providing him with the 26 AT&T Phones for unlocking.  Mr. Brown told the investigators that he would send the new AT&T Phones to them after they were unlocked.  While at Mr. Brown's residence, the investigators observed approximately 20 laptops and computer monitors with attached USB cables, as well as many cellular phones in the living room area of the residence.  Mr. Brown explained that he would be moving this equipment into his basement shortly so that he could free up space for additional unlocking equipment.  Mr. Brown stated that he had two female employees assisting him with unlocking.  Mr. Brown represented that he could unlock 20 Phones at a time using the equipment in his residence, and that he had recently unlocked 3,000 new handsets for another client located in the Miami-Dade area.

59.     Between April 15, 2019 and April 25, 2019, Mr. Brown provided updates to the investigators regarding his progress on unlocking.  On April 25, 2019, Mr. Brown confirmed he had been able to unlock 21 of the 26 new AT&T Phones, and shipped the Phones back to the investigators.  Mr. Brown emailed an invoice to the investigators with the charges for unlocking and shipping, which the investigators paid.  Mr. Brown charged the investigators $15 to $25 to unlock each AT&T Phone.  The investigators received the shipment of AT&T Phones on April 27, 2019, and confirmed that 21 of the Phones were unlocked.

60.     On May 6, 2019, the investigators reached out to Mr. Brown by text message, inquiring if he knew of any persons in the area who could sell them new, locked AT&T Phones.  Mr. Brown warned investigators to be careful in dealing with AT&T Phones because he was aware that AT&T had "sued a few wholesalers in doral[sic] and around Florida late last year for buying, unlocking and reselling there[sic] products without authorization."  Mr. Brown also linked the investigators to a Cricket Wireless press release regarding these lawsuits.

61.     On May 28, 2019, the investigators emailed Mr. Brown a list of new, locked AT&T Phones, including the model and IMEI number, inquiring if Mr. Brown could unlock them.  On May 31, 2019, Mr. Brown advised the investigators that AT&T's server was rejecting several of the IMEIs, but that he would attempt to unlock the IMEIs using his physical "unlocking box."  On June 3, 2019, Mr. Brown emailed unlocking codes for 10 of the AT&T Phones to the investigators.  The investigators paid Mr. Brown $30 each for unlocking these Phones.

62.     On September 4, 2019, AT&T's investigators reached out to Mr. Brown via text message regarding unlocking AT&T Phones.  On September 6, 2019, Mr. Brown advised the investigators that he was unable to unlock AT&T or Cricket Apple iPhones because the "server"

was down.  Mr. Brown explained that ordinarily, he was able to access this server through a third-party contact with a backdoor into AT&T's server.  Mr. Brown advised the investigators to stay with mobile phone brands that were easier to unlock, such as ZTE and Samsung.

63.     On September 11, 2019, the investigators met with Mr. Brown in the parking lot of a Citgo gas station located at 5601 Johnson Street, Hollywood, Florida 33024.  The investigators provided Mr. Brown with 28 new, locked AT&T Phones.  During the meeting, when the investigators expressed concern about the phones re-locking, once unlocked by Mr. Brown, Mr. Brown assured them that he guaranteed his work and that the new AT&T Phones would remain unlocked once they were unlocked.  Mr. Brown also recommended certain mobile phone models that the investigators should deal in because they were "trending" and would thus be profitable to unlock and resell.

64.     Between September 11, 2019 and October 11, 2019, Mr. Brown provided the investigators with updates on his unlocking progress for the 28 AT&T Phones.  On September 23, 2019, Mr. Brown informed the investigators that AT&T Phones were particularly difficult to unlock at present, and that he was encountering difficulties because he knew that AT&T had sued websites, making it difficult to get unlocking codes.

65.     On October 11, 2019, the investigators met at the entrance to the gated community for his residence, in Miramar, Florida.  Mr. Brown returned the AT&T Phones to the investigators, informing the investigators he had been able to unlock 13 of the 28 new AT&T Phones they had provided, and that he had unlocked these Phones by purchasing unlocking codes from a third party whom he refused to identify.  Mr. Brown again cautioned the investigators to stay away from Cricket and AT&T Phones because they were difficult to unlock and AT&T was suing "his boss."  The investigators paid Mr. Brown $15 to $25 for each of the unlocked Phones.

66.     In total, from March 4, 2019 to October 11, 2019, Mr. Brown unlocked 48 new, locked AT&T Phones for the investigators, as set forth in the table below:

| Date | Model | Quantity | Unit price |
|------|-------|----------|------------|
| 4/3/2019 | LG Phoenix 4 | 3 | $15 |
| 4/3/2019 | LG Xpression Plus | 1 | $15 |
| 4/25/2019 | Samsung Galaxy Sol | 3 | $15 |
| 4/25/2019 | Samsung Galaxy J2 Pure | 3 | $15 |
| 4/25/2019 | Samsung Galaxy Express Prime | 3 | $15 |
| 4/25/2019 | Motorola E5 Supra | 3 | $25 |
| 4/25/2019 | Alcatel CameoX | 1 | $15 |
| 4/25/2019 | Alcatel IdealXtra | 1 | $15 |
| 4/25/2019 | Alcatel Tetra | 7 | $15 |
| 6/4/2019 | Samsung Galaxy Express Prime 3 | 10 | $30 |
| 10/17/2019 | Alcatel TETRA | 2 | $15 |
| 10/17/2019 | Alcatel ideal XTRA | 1 | $15 |
| 10/17/2019 | LG phoenix4 | 3 | $15 |
| 10/17/2019 | Alcatel TETRA | 1 | $15 |
| 10/17/2019 | LG Stylo 3 | 1 | $15 |
| 10/17/2019 | Motorola e5 | 4 | $25 |
| 10/17/2019 | Motorola G7 | 1 | $25 |

**VI.**   **Substantial Harm Caused by Defendants' Misconduct**

67.     Defendants' actions significantly harm AT&T in numerous ways, including *inter alia*: (1) AT&T is unable to recoup its substantial investment in subsidizing AT&T Phones; (2) AT&T is deprived of the opportunity to earn profits by providing wireless service to legitimate AT&T consumers during the AT&T Service Period; (3) Defendants' infringement of the AT&T Marks causes significant ongoing and irreparable losses and harm to AT&T's brand, image, and reputation; and (4) Defendants' actions seriously and irreparably interfere with AT&T's relationships with its Authorized Dealers, National Retailers, and customers.  All of these factors undermine AT&T's competitive edge in the cellular phone industry.

68.     In addition, when AT&T Phones are unlocked, removed from their original packaging, and resold by Defendants or their co-conspirators, AT&T is also harmed because it is no longer able to control the quality of its product, and because the process of unlocking and reselling an AT&T Phone may void the manufacturer's warranty on the device.  AT&T assists consumers with manufacturer warranty service by offering an expedited warranty exchange program.  Because AT&T coordinates manufacturer warranty service requests for consumers and invests considerable resources in its warranty exchange program, both consumers and AT&T may be harmed when an AT&T Phone that has been altered or sold by Defendants or their co-conspirators is submitted to AT&T or the manufacturer for warranty repair.  AT&T incurs expenses in providing shipping and return services to consumers who attempt to obtain warranty service for AT&T Phones through AT&T's warranty exchange program, and in inspecting AT&T Phones that are out of warranty.  Moreover, even if a manufacturer provides warranty service to a consumer with an unlawfully resold AT&T Phone that should not qualify for warranty service, AT&T still suffers harm because the manufacturers of AT&T Phones build the

cost of warranty repairs into the price that AT&T pays for each AT&T Phone.  Therefore, providing warranty service to ineligible devices harms AT&T by increasing the costs it must pay for each AT&T Phone.  Finally, consumers who purchase AT&T Phones from Defendants or their co-conspirators without realizing they have been unlawfully unlocked and resold may turn to AT&T for warranty service in reliance on the AT&T Marks on the Phones, but be unable to obtain warranty service.

69.     AT&T has also suffered harm from the significant time and effort, and the associated cost it has spent remedying Defendants' fraudulent actions within the AT&T system and supply chain.

**VII.   Phone Trafficking is Unlawful**

70.     The unlawfulness of the conduct involved in the Prepaid Phone Trafficking Conspiracy is widely recognized and acknowledged.

71.     AT&T has filed multiple lawsuits in numerous federal courts across the country against bulk phone traffickers and unlocking entities, and has succeeded in obtaining Final Judgments and Permanent Injunctions.  Other wireless providers such as MetroPCS, Sprint Solutions Inc., T-Mobile USA, Inc., and TracFone Wireless, Inc., have filed multiple lawsuits in numerous federal courts across the country against bulk phone traffickers.  Each of those entities has succeeded in obtaining Final Judgments and Permanent Injunctions, and in enforcing Permanent Injunctions where needed.

72.     Similarly, although the Unlocking Consumer Choice and Wireless Competition Act, Pub. L. 113-144 ("Unlocking Act") of 2014 allows the individual owner of a cellular phone to unlock their phone solely for the legitimate purpose of connecting to a wireless network, the legislative history makes clear that the Unlocking Act was not intended to authorize prepaid

wireless phone trafficking such as the Prepaid Phone Trafficking Conspiracy.  Indeed, the July

17, 2014 Senate Report, S. Rep. 113-212, states (emphases added):

> Neither of the methods for unlocking recognized by the legislation excuses owners from compliance with applicable service agreements they may have with the wireless carriers that service their phones.  Such agreements may, for example, require fulfillment of an applicable postpaid service contract, device financing plan, or payment of an applicable early termination fee. Moreover, *nothing in the bill permits third parties to unlock devices independently of the device owner's direction, or for a purpose other than allowing the owner or a family member to connect to a new wireless network*. As the Librarian of Congress explained with respect to the scope of permissible commercial activity under the 2010 determination that is reinstated by the bill, '*the designation of this class will not benefit those who engage in the type of commercial activity that is at the heart of the objections of opponents of the proposed class: the 'bulk resellers' who purchase new mobile phone handsets at subsidized prices and, without actually using them on the networks of the carriers who market those handsets, resell them for profit*.'"

73.     Likewise, in the subsequent October 2015 Section 1201 Rulemaking: Sixth

Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, the Register

of Copyrights specifically noted that "there is also an unlawful form of large-scale unlocking that

involves the bulk purchase of unused handsets that have been offered for sale at subsidized

prices by prepaid wireless carriers, and then unlocking and reselling those handsets for a profit."

The Register also noted that "there was universal agreement that any exemption for cellphones

should be fashioned so as to exclude trafficking activities that seek illegitimately to profit from

subsidies offered by prepaid phone providers."  The Register further noted that past exemptions

for unlocking were also "designed to prevent the 'illegal trafficking of mobile phones.'"  Thus,

the Register recommended that lawful unlocking under the Unlocking Act be limited to "used"

devices, namely, devices that "ha[ve] been lawfully acquired and activated on the wireless

telecommunications network of a carrier."  In a subsequent proceeding since that time, the

Acting Register again emphasized that the exemption was limited to lawfully acquired devices and inapplicable to trafficking prohibitions.

74.     Courts have also consistently held any modern cellular phone containing an electronic processor to be a computer which is subject to protection against unauthorized access under the Computer Fraud and Abuse Act ("CFAA").  Likewise, Courts have held that unlocking of phone software, and use of proprietary codes to gain access to locked phones can form the basis for a CFAA claim.

<u>**COUNT ONE**</u>

**CONTRIBUTORY TRADEMARK INFRINGEMENT**

75.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

76.     Defendants unlocked new, locked AT&T Phones for their co-conspirators. Defendants knew that their co-conspirators intended to resell unlocked AT&T Phones.  By misappropriating and using at least one of the AT&T Marks in connection with the Prepaid Phone Trafficking Conspiracy, Defendants knowingly aided and enabled resellers of their products to market them to members of the general public in a way that infringes at least one of the AT&T Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

77.     Defendants' co-conspirators' unlawful, unauthorized, and unlicensed sale of the unlocked AT&T Phones has contributed to the creation of express and implied misrepresentations that the AT&T Phones, as sold by Defendants' co-conspirators, were created, authorized or approved by AT&T, and include the warranties applicable to new, unaltered

AT&T Phones.  Unlocked AT&T Phones sold by Defendants' co-conspirators are materially altered and different from AT&T Phones sold directly by AT&T and AT&T Authorized Dealers.

78.     Defendants' co-conspirators' unauthorized use of AT&T Marks in connection with their participation in the Conspiracy is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of AT&T.

79.     Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase AT&T Phones altered by Defendants to believe that they are purchasing wireless phones approved by AT&T that qualify for their original warranties.

80.     Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

81.     AT&T has been damaged and continues to suffer damages as a result of Defendants' actions.

82.     There is no adequate remedy at law to fully compensate AT&T for the harm caused by Defendants' actions.

83.     AT&T is entitled to appropriate relief as prayed for hereinafter, including injunctive relief.

84.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiffs' lost profits, Defendants' profits, and Plaintiffs' attorneys' fees.

## COUNT TWO

### COMMON LAW FRAUD
### AND FRAUDULENT MISREPRESENTATION

85.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

86.     Defendants and/or their co-conspirators working at Defendants' direction knowingly misrepresented to AT&T that they were authorized to access AT&T's servers for legitimate purposes.  At the time they accessed AT&T's servers, Defendants knew they were accessing AT&T's servers for the purpose of obtaining unlocking codes for new, locked AT&T Phones.  Defendants and/or their co-conspirators were also aware that they were not authorized to access AT&T's servers for the purpose of obtaining unlocking codes for new, locked AT&T Phones, and that they were not authorized to unlock new, locked AT&T Phones.  Defendants and/or their co-conspirators accessed AT&T's servers to obtain unlocking codes for Defendants' own financial gain.

87.     AT&T relied on Defendants' material misrepresentations in allowing Defendants and/or their co-conspirators to access its servers for what it believed was a legitimate purpose. Had AT&T known the truth about Defendants' intentions with respect to accessing AT&T's servers, AT&T would not have granted Defendants access.  AT&T's reliance on the misrepresentations and concealments of Defendants and/or their co-conspirators was reasonable under the circumstances.

88.     AT&T has been damaged in excess of $75,000 and continues to suffer damages as a result of Defendants' actions.

89.     Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT THREE

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

90.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

91.     An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and altered AT&T Phones under at least one of the AT&T Marks.

92.     An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully access AT&T's servers to acquire unlocking codes for new, locked AT&T Phones.

93.     The aforementioned acts of Defendants and their co-conspirators results in federal common law and statutory trademark infringement, contributory trademark infringement, tortious interference, unjust enrichment, and violations of the Computer Fraud and Abuse Act and Digital Millennium Copyright Act, among other things.

94.     Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.  As part of the Conspiracy, each of the Defendants, directly or indirectly through other co-conspirators, regularly and systematically misrepresent to AT&T, Authorized Dealers, and National Retailers that the Phones are being acquired for a legitimate purpose, that the Phones will be used by Defendants or other legitimate consumers on AT&T Authorized Networks, and that they will perform in accordance with the Terms and Conditions.  In addition, as part of the Conspiracy, each of the Defendants, directly or indirectly through other co-conspirators, regularly and systematically misrepresent to AT&T that they are accessing AT&T's servers for a legitimate purpose.

95.     AT&T has been proximately damaged in excess of $75,000 by the conspiracy and Defendants' actions in furtherance thereof.

96.     Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT FOUR

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

97.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

98.     AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

99.     Defendants and their co-conspirators are knowingly trafficking in unlocking code/passwords that effectively control access to AT&T Software and use of the AT&T Phone by offering to the public its alteration service and unauthorized access to the Phone and software for a fee.

100.    Through the Conspiracy, Defendants are knowingly trafficking in the confidential access codes/passwords with the intent to defraud and harm AT&T by facilitating unauthorized unlocking of AT&T Phones as part of the Prepaid Phone Trafficking Conspiracy.

101.    Defendants' transfer of the Phones and confidential unlocking codes/passwords to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029(e)(5) in that the unlocking codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the unlocking codes/passwords with intent to transfer or dispose of them.

102.    Defendants' trafficking of the Phones substantially affects interstate commerce and communication in that the unlocking codes/passwords are trafficked over the internet, throughout the United States, and around the world, and AT&T Phones are used in and affect

interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

103.    Defendants' trafficking of AT&T's unlocking codes/passwords has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one year period.

104.    With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing the damage to AT&T Phones and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

105.    Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' trafficking of unlocking codes/passwords, as well as tracking down fraudulently sold AT&T Phones.

106.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants access protected computers without authorization.

107.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

108.    Defendants' conduct is intentional, malicious and willful.

109.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I):

the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT FIVE

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

110.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

111.    The manufacturers that produce wireless phones for AT&T install proprietary and confidential software on the AT&T Phones to lock the Phones to AT&T's Authorized Networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks.  Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period, and has the SIM Lock installed on AT&T Phones to prevent unauthorized access to the proprietary AT&T Software and unauthorized use of the AT&T Phone.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

112.    AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

113.    In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire Phones from AT&T and in so doing void any purchase agreement and any legitimate access to the software and passwords on the AT&T Phones.  As such, Defendants' access to the Phones is not authorized in any way.

36

114.    Defendants unlawfully access, or otherwise facilitate access, to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on wireless networks other than AT&T Authorized Networks.  Defendants' entry of unlocking codes/passwords into AT&T Phones provides unauthorized access to proprietary AT&T Software and the AT&T Phone by circumventing the SIM Lock.

115.    Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment in its Phones.

116.    AT&T controls access to AT&T Servers.  AT&T does not authorize third parties to access AT&T Servers in order to obtain unlocking codes for new, locked AT&T Phones.

117.    AT&T Servers are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

118.    In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to access AT&T Servers and obtain unlocking codes.  Upon information and belief, Defendants and/or their co-conspirators use confidential codes or passwords to gain illegal access to AT&T Servers.  Defendants' access to AT&T Servers is not authorized in any way.

119.    Defendants' illegal and unauthorized access of AT&T Phones and AT&T Servers allows them to improperly misappropriate AT&T's investment in its Phones.

120.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States,

and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.  AT&T Servers connect to the internet, and are used in and affect interstate commerce and communication.

121.    Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones and AT&T Servers has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

122.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.  AT&T has also spent in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access to AT&T Servers.

123.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed protected AT&T Phones and/or AT&T Servers without authorization.

124.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

125.    Defendants' activities in accessing, or otherwise facilitating access to AT&T Phones without authorization and accessing the proprietary AT&T Software therein, and in

accessing AT&T Servers constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

126.    Defendants' conduct is intentional, malicious and willful.

127.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT SIX

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

128.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

129.    The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period, except in specific circumstances not applicable here.  Inputting the unlawfully obtained unlocking code of a AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

130.    AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

131.    Defendants unlawfully access, or otherwise facilitate access to, AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary software that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.  Defendants' entry of unlocking codes/passwords into AT&T Phones, provides unauthorized access to proprietary AT&T Software.

132.    AT&T owns and controls access to AT&T Servers.  AT&T does not authorize third parties to access AT&T Servers in order to obtain unlocking codes for new, locked AT&T Phones.

133.    AT&T Servers are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

134.    In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to access AT&T Servers and obtain unlocking codes.  Upon information and belief, Defendants and/or their co-conspirators use confidential codes or passwords to gain illegal access to AT&T Servers.  Defendants' access to AT&T Servers is not authorized in any way.

135.    Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of AT&T Phones and AT&T Servers.

136.    Defendants' access, or otherwise facilitation of access, of the AT&T Phones and AT&T Servers allows them to improperly misappropriate AT&T's substantial financial investment in its Phones.

137.     Defendants' illegal and unauthorized access of AT&T Phones and AT&T Servers allows them to improperly misappropriate AT&T's investment in its Phones.

138.     Defendants' activities substantially affect interstate commerce and communication in that AT&T Phones are trafficked over the internet, throughout the United States, and around the world, are used in and affect interstate commerce and communication, and use wireless telecommunications service pursuant to licenses issued by the Federal Communications Commission.  AT&T Servers connect to the internet, and are used in and affect interstate commerce and communication.

139.     Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones and AT&T Servers has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

140.     With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.  AT&T has also spent in excess of $5,000 taking remedial action to counteract Defendant's unauthorized access to AT&T Servers.

141.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed protected AT&T Phones and/or AT&T Servers without authorization.

142.     With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

143.     Defendants' activities in accessing, or otherwise facilitating access to, AT&T Phones without authorization and accessing the proprietary AT&T Software therein, and in accessing AT&T Servers constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

144.     Defendants' conduct is intentional, fraudulent, malicious and willful.

145.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT SEVEN

### OBTAINING INFORMATION FROM A PROTECTED COMPUTER
### 18 U.S.C. § 1030(a)(2)(C)

146.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

147.     AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

148.     The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and

prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

149.    Defendants unlawfully access, or otherwise facilitate access to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.

150.    Defendants use, or otherwise facilitate others to use unlocking codes/passwords to unlock, and thereby obtain unauthorized access to AT&T Phones.  Such unauthorized access therefore allows Defendants or others whom Defendants have assisted to obtain information from a protected computer.

151.    AT&T Servers are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

152.    AT&T owns and controls access to AT&T Servers.  AT&T does not authorize third parties to access AT&T Servers in order to obtain unlocking codes for new, locked AT&T Phones.

153.    In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to access AT&T Servers and obtain unlocking codes.  Defendants' access to AT&T Servers is not authorized in any way.  Such unauthorized access therefore

allows Defendants or others whom Defendants have assisted to obtain information from a protected computer.

154.   Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones and AT&T Servers has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

155.   With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.  AT&T has also spent in excess of $5,000 taking remedial action to counteract Defendant's unauthorized access to AT&T Servers.

156.   Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed protected AT&T Phones and/or AT&T Servers without authorization.

157.   With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

158.   Defendants' activities in accessing, or otherwise facilitating access to, AT&T Phones without authorization and accessing the proprietary AT&T Software therein, and in accessing AT&T Servers constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

159.    Defendants' conduct is intentional, malicious and willful.

160.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

<u>**COUNT EIGHT**</u>

**CIRCUMVENTION OF PROPRIETARY SOFTWARE PROTECTION SYSTEM
17 U.S.C. § 1201(a)(1)**

161.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

162.    The AT&T Phones contain a SIM Lock, a technological measure that in the ordinary course of the measures' operation requires the application of information, or a process or a treatment, with AT&T's authority, to gain access to the proprietary AT&T Software, as set forth in 17 U.S.C. § 1201.

163.    The SIM Lock is a technological measure that effectively controls access to the proprietary AT&T Software.

164.    AT&T did not give Defendants or their co-conspirators authority to unlock, or otherwise to avoid, bypass, remove, disable, deactivate, or impair the technological measures for effectively controlling access to and operation of the AT&T Software.

165.    AT&T did not grant Defendants or their co-conspirators the authority to circumvent the technological measures for effectively controlling access to the AT&T Software.

166.     Defendants are in possession of unlocking codes and devices that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock that effectively controls access to the proprietary AT&T Software.  Defendants input unlocking codes, or use unlocking devices to unlock new, locked AT&T Phones by avoiding, bypassing, removing, disabling, deactivating, or otherwise impairing the SIM Lock.  Unlocking a new, locked AT&T Phone provides unauthorized access to the proprietary AT&T Software.

167.     Defendants acted, and/or knowingly engaged in a conspiracy, to avoid, bypass, remove, disable, deactivate, or impair a technological measure for effectively controlling access to the proprietary software without AT&T's authority.

168.     Defendants engaged in this misconduct so that they could directly profit from unlocking phones for co-conspirators, and so their co-conspirators could resell the altered devices in bulk for a profit, and not for the sole purpose of enabling the owner of a wireless device to lawfully connect to a wireless telephone communication network.

169.     Defendants acted to, and/or knowingly engaged in a conspiracy designed to, circumvent a technological measure that effectively controls access to the AT&T Software that is protected under title 17 of the United States Code, and thereby violated 17 U.S.C. § 1201.

170.     Defendants' or their co-conspirators' conduct does not fall within any of the exemptions to 17 U.S.C. § 1201.

171.      Defendants' conduct has caused and, unless enjoined, will continue to cause AT&T severe, immediate, and irreparable injury and damages for which AT&T has no adequate remedy at law.  AT&T is entitled to injunctive relief restraining such conduct, an award of actual or statutory damages, as well as other equitable and legal relief.

## COUNT NINE

### TRAFFICKING IN CIRCUMVENTION TECHNOLOGY
### 17 U.S.C. §§ 1201(a)(2), (b)(1)

172.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

173.    The AT&T Phones contain a SIM Lock, a technological measure that in the ordinary course of the measures' operation requires the application of information, or a process or a treatment, with AT&T's authority, to gain access to the proprietary AT&T Software, as set forth in 17 U.S.C. § 1201.

174.    The SIM Lock is a technological measure that effectively controls access to the proprietary AT&T Software.

175.    Defendants are in possession of unlocking codes and devices that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock that effectively controls access to the proprietary AT&T Software.  Defendants input unlocking codes, or use unlocking devices to unlock new, locked AT&T Phones by avoiding, bypassing, removing, disabling, deactivating, or otherwise impairing the SIM Lock.  Defendants also instruct members of the public on how to input unlocking codes on new, locked AT&T Phones to avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock.  Unlocking a new, locked AT&T Phone provides unauthorized access to the proprietary AT&T Software.

176.    Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that protects the AT&T Software from unauthorized access by knowingly transferring to members of the public unlocking codes for AT&T Phones for a fee.

177.     Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that effectively controls access to AT&T Software by offering to the public their unlocking service for a fee.

178.     Defendants' conduct does not fall within any of the exemptions.

179.     The unlocking service and unlocking codes provided by Defendants are primarily designed or produced for the purpose of circumventing AT&T's SIM Lock technological measure that effectively controls access to AT&T Software that is protected under title 17 of the United States Code.

180.     The unlocking service and unlocking codes provided by Defendants have, at most, only a limited commercially significant purpose or use other than circumventing AT&T's SIM Lock technological measure that effectively control access to AT&T Software that is protected under title 17 of the United States Code.

181.     Defendants knowingly market their unlocking service and unlocking codes for use in circumventing AT&T's SIM Lock technological measure that effectively controls access to AT&T Software that is protected under title 17 of the United States Code.

182.     Defendants have violated, and continue to violate, Section 1201 of the Copyright Act, for which AT&T has no adequate remedy at law.  As a result, AT&T has been irreparably injured by Defendants' conduct and will continue to be irreparably injured unless the violating activities of Defendants are enjoined by this Court.

## COUNT TEN

### TORTIOUS INTERFERENCE

183.     AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

184.    A business relationship exists between AT&T and current and prospective AT&T customers.

185.    A business relationship exists between AT&T and Authorized Dealers and National Retailers of AT&T Phones.

186.    A contractual relationship exists between AT&T and its customers, the purchasers of its AT&T Phones and wireless service.

187.    There is a high probability of future economic benefit to AT&T as a result of these business and contractual relationships.

188.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business and contractual relationships between AT&T and legitimate AT&T customers or prospective customers.

189.    Specifically, but without limitation, Defendants knew that AT&T has contractual and business relationships, with legitimate consumers of AT&T Phones and wireless service. Defendants interfered with these relationships by engaging in the Prepaid Phone Trafficking Conspiracy and diverting sales of AT&T Phones from legitimate customers intending to activate the phones on AT&T Authorized Networks.  Defendants also interfered with these relationships by, *inter alia*, inducing purchasers of AT&T Phones to breach their contracts with AT&T, and by inducing purchasers of AT&T Phones to fraudulently enter into contracts with AT&T by activating AT&T Phones and then breaching such contracts.

190.    Defendants also knew that AT&T has business relationships with Authorized Dealers and National Retailers of AT&T Phones to provide them with sufficient quantities of Phones for their legitimate consumers' use exclusively on AT&T Authorized Networks.

Defendants' Prepaid Phone Trafficking Conspiracy has resulted in substantial numbers of AT&T Phones that are never activated on AT&T service, thereby substantially harming AT&T and its relationship with its Authorized Dealers and National Retailers.

191.    Defendants are intentionally and unjustifiably interfering with AT&T's contracts and business relationships through improper means including fraudulent statements and misrepresentations and misappropriating legitimate customer purchases, as set forth in detail above, and in violation of the law as set forth in other Counts.  Defendants engaged in the acts of interference.

192.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business relationships and contracts between AT&T, and its Authorized Dealers, National Retailers and legitimate AT&T customers.

193.    Defendants' acts injured AT&T's business and contractual relationships.

194.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

195.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT ELEVEN

### UNJUST ENRICHMENT

196.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

197.    By charging a fee for unlocking new, locked AT&T Phones without authorization, Defendants have obtained benefits in excess of $75,000 from AT&T which have

caused significant harm to AT&T and resulted in significant financial gain to Defendants through their profits from unlocking new, locked AT&T Phones.

198.    Defendants have knowingly and voluntarily obtained the benefits.

199.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying AT&T the value of the benefits Defendants acquired.

## COUNT TWELVE

### CONVERSION

200.    AT&T reasserts the allegations set forth in Paragraphs 1 through 74 above and Exhibits 1 through 6 as though fully set forth herein.

201.    Defendants have and are engaged in acts of conversion in violation of the law of the State of Florida.

202.    AT&T has the right to provide its Phones and wireless service to the public. Defendants have no such privilege or right.

203.    Defendants knew or should have known that they were interfering with AT&T's rights to provide AT&T Phones and wireless service by unlocking new, locked AT&T Phones without authorization.

204.    Defendants are wrongfully interfering with AT&T's rights to provide AT&T Phones and wireless service by unlocking new, locked AT&T Phones without authorization.

205.    Defendants intentionally and willfully exerted dominion and ownership over the AT&T Phones.

206.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' conversion of AT&T's property.

207.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## DEMAND FOR JURY TRIAL

AT&T demands a trial by jury on all triable issues.

WHEREFORE, Plaintiffs Cricket Wireless LLC, AT&T Mobility LLC, and AT&T Intellectual Property II, L.P., respectfully request that this Court enter final judgment and permanent injunctive relief in favor of the Plaintiffs and against Defendants, as follows:

(a)     awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b)     awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c)     granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(d)     requiring Defendants, pursuant to the Lanham Act to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the AT&T Marks, a confusingly similar copy thereof; and

(e)     granting such further relief as this Court deems just and proper.

Respectfully submitted this 26th day of October, 2020.

By: /s/ *Timothy J. McGinn*
George S. LeMieux (FL Bar No. 16403)
Timothy J. McGinn (FL Bar No. 1000377)
GUNSTER, YOAKLEY & STEWART, P.A.
600 Brickell Avenue, Suite 3500
Miami, FL 33131
Telephone:  (305) 376-6000
Facsimile:  (305) 376-6010
Email:  glemieux@gunster.com
        tmcginn@gunster.com

Raymond O. Aghaian (CA Bar No. 218294)
Byron R. Chin (CA Bar No. 259846)
Adam Wiley (CA Bar No. 298686)
*Pro hac vice applications forthcoming*
KILPATRICK TOWNSEND & STOCKTON LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90212-2018
Telephone:  (310) 248-3830
Facsimile:  (310) 860-0363
Email: raghaian@kilpatricktownsend.com
        bchin@kilpatricktownsend.com
        awiley@kilpatricktownsend.com